# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | | |
|---|---|---|
| **MELROY CORT,** | ) | Case No. 2:23-cv-917 |
| | ) | |
| and | ) | Judge |
| | ) | |
| **SAMANTHA CORT,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **RANDY THORP, SHERIFF OF** | ) | |
| **LICKING COUNTY, OHIO** | ) | |
| in his official capacity, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **ALEXANDER CALDWELL, DEPUTY** | ) | |
| Licking County Sheriff's Office, in his | ) | |
| personal capacity, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **GEORGE LORENZ, SERGEANT,** | ) | |
| Licking County Sheriff's Office, | ) | |
| in his personal capacity, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **CITY OF PATASKALA, OHIO,** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **ZACHARY SARVER, OFFICER,** | ) | |
| City of Pataskala Division of Police, in his | ) | |
| personal capacity, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **JOHNESSA JUSTICE, OFFICER,** | ) | |
| city of Pataskala Division of Police, in her | ) | |
| personal capacity, | ) | |
| | ) | **COMPLAINT** |
| Defendants. | ) | **WITH JURY DEMAND** |

I.      **INTRODUCTION**

1.      This is an action for compensatory and punitive damages arising from the false arrest, malicious prosecution, battery, and defamation of Plaintiff Melroy Cort, a retired U.S. Marine Corps Corporal who lost both of his legs in the service of his country, and the unlawful entry and trespass on the property of Cpl. Cort and his wife, Plaintiff Samantha Cort, in violation of the 4th and 14th Amendments to the U.S. Constitution, Ohio Revised Code § 2307.60, and the common law of the state of Ohio. On October 21, 2022, Defendants Alexander Caldwell, a Licking County Deputy Sheriff, and Zachary Sarver and Johnessa Justice, two officers with the Pataskala Division of Police, who were answering a call about a civil dispute about the property line between the Corts' land and that of their neighbors, entered the Corts' property without a warrant and against clear instruction from Cpl. Cort, intruded on the side and rear curtilage of the Corts' home, and refused to leave despite Cpl. Cort's clear, repeated instructions.

Defendants Caldwell, Sarver, and Justice then unlawfully arrested Cpl. Cort by surrounding him and using their feet to stop him from moving his wheelchair. When Cpl. Cort tried to use his wheelchair and upper body to move past them and steer them off of his property, as he was legally privileged to do, the Defendants falsely claimed he was assaulting them. In front of Ms. Cort and the Corts' children, they then forced Cpl. Cort out of his chair and onto the ground, handcuffed him, and detained him in a patrol car. Defendant Lorenz, Caldwell's supervisor, then arrived and learned that Caldwell, Sarver, and Justice had entered Cpl. Cort's property and arrested him without cause. Defendant Lorenz nevertheless ordered Cpl. Cort's continued detention and transport to jail, where he was held for the ensuing three days and falsely charged with criminal charges, which were later dismissed. The Defendants then made public statements defaming Cpl. Cort, including falsely claiming he spat on Defendant Caldwell.

## II.     JURISDICTION AND VENUE

2.     This Court has federal question jurisdiction over the Plaintiffs' federal claims pursuant to Title 28 U.S.C. Section 1331, this being an action pursuant to Title 42 U.S.C. Section 1983 and the Fourth and Fourteenth Amendments to the United States Constitution, and supplemental jurisdiction over the Plaintiffs' state claims pursuant to Title 28 U.S.C. Section 1367, as the state and federal claims arise out of the same core of operative facts.

3.     The wrongful acts alleged below were committed in Licking County, Ohio, within the jurisdiction of the U.S. District Court for the Southern District of Ohio, Eastern Division.

## III.     PARTIES

4.      Plaintiff Melroy Cort is a resident of Etna, Ohio, in Licking County, Ohio.

5.     Plaintiff Samantha Cort is Melroy Court's spouse, and a resident of Etna, Ohio, in Licking County, Ohio.

6.     Defendant Randy Thorp is the Sheriff of Licking County, Ohio, and the chief law enforcement officer and law enforcement policy-maker for Licking County.  At all times material to this case, the deputies and supervisors under Mr. Thorp's command, including Defendants Caldwell and Lorenz, acted according to the policies maintained by Defendant Thorp and the customs of his office and according to the training provided to them under Defendant Thorp's direction.  At all times material to this case, Defendant Thorp acted under color of state law.  He is sued in his official capacity.

7.     Defendant Alexander Caldwell is a Deputy in the office of the Sheriff of Licking County, Ohio.  At all times material to this case, Defendant Caldwell acted under color of state law.  Defendant Caldwell is sued in his personal capacity.

8. Defendant George Lorenz is a Sergeant in the office of the Sheriff of Licking County, Ohio. At all times material to this case, Defendant Lorenz acted under color of state law. Defendant Caldwell is sued in his personal capacity.

9. Defendant City of Pataskala, Ohio, is a political subdivision and municipality of the State of Ohio. At all times material to this case, the officers of the Pataskala Division of Police, including Defendants Sarver and Justice, acted according to the policies maintained by the City of Pataskala and its customs and according to the training provided to them at the City's direction. At all times material to this case, the City of Pataskala and its officers acted under color of state law.

10. Defendant Zachary Sarver is a police officer employed by the City of Pataskala in its Division of Police. At all times material to this case, Defendant Sarver acted under color of state law. Defendant Sarver is sued in his personal capacity.

11. Defendant Johnessa Justice is a police officer employed by the City of Pataskala in its Division of Police. At all times material to this case, Defendant Justice acted under color of state law. Defendant Justice is sued in her personal capacity.

## IV. FACTS

### A. Plaintiffs Melroy and Samantha Cort Relocate to Etna, Ohio.

12. Plaintiff Melroy Cort is a veteran of the U.S. Marine Corps who retired from service with the rank of Corporal in 2007.

13. Cpl. Cort joined the Marine Corps shortly after graduating from high school. He was deployed to Iraq in the summer of 2005.

14. On December 7, 2005, approximately four months into his deployment, the vehicle Cpl. Cort was driving was struck by an improvised explosive device. He was

4

catastrophically injured. Both of his legs were amputated above the knee, and he uses a wheelchair for mobility. He also has limited use of one of his thumbs.

15. In 2018, the home of Cpl. Cort, Samantha Cort, and their children was severely damaged by a fire, destroying most of their possessions.

16. In 2020, two nonprofit organizations selected Cpl. Cort and his family as part of a program to build homes for wounded veterans. The organizations built a new single-family home for the Corts on a property in Etna, Ohio, where they now live.

    **B.**    **Defendant Caldwell Learns There Is a Civil Dispute Between the Corts and Their Neighbors and Decides to Intervene on the Neighbors' Behalf.**

17. On October 21, 2022, Defendant Caldwell was dispatched to respond to a call from a neighbor of the Corts who alleged that Cpl. Cort had damaged a fence between her back yard and the side yard of the Corts' home.

18. Defendant Caldwell arrived at the neighbor's home and spoke to her. He then walked with her into her back yard and saw Cpl. Cort in the back yard of his house. He called to Cpl. Cort and asked if he would come closer to the fence to talk to him. Cpl. Cort began to do so, but then Caldwell announced that he would instead come to Cpl. Cort's side of the fence. Cpl. Cort told Caldwell he should stay on the other side of the fence and they could talk where they were, and specifically stated, "I do not want you on my property, just to let you know."

19. Defendant Caldwell then returned to speaking with the neighbor who had called and collected information clarifying that the neighbor's complaint about Cpl. Cort damaging the fence was purely civil and not criminal in nature.

20. Specifically, Defendant Caldwell learned that the neighbor knew Cpl. Cort honestly and reasonably believed the fence was on his side of the property line and had confirmed this by viewing an aerial photo provided by Licking County. Deputy Caldwell also

5

learned that the neighbor did not have a survey disputing Cpl. Cort's belief about which side of the property line the fence was on, and that there was ambiguity about the property line that could not be resolved without a proper survey.

21. Defendant Caldwell also learned that the neighbor and another family member in her home, who were white, resented the presence of the Corts, a Black family, in their neighborhood.

22. In particular, the neighbor repeatedly emphasized that Cpl. Cort had not paid for the purchase of his house, which he and his family had received through a charitable program for veterans after a devastating fire at their former home.

23. Defendant Caldwell also learned that the neighbor had been repeatedly making complaints against the Corts, including about the property line dispute and about the Corts lawful and constitutionally protected use of firearms for target practice on their property, and had been repeatedly told by other law enforcement personnel that the Corts were within their rights and that the matter was a civil dispute that did not require law enforcement involvement.

24. After learning this, Defendant Caldwell told the Corts' neighbor that he was not in a position to resolve the dispute over the property line without a survey.

25. Damaging another person's property is a misdemeanor offense under Ohio law, but damaging one's own property is not a crime. Ohio law also protects the right of a property owner to damage or destroy another person's property if it encroaches on the owner's property.

26. Even if the Corts were mistaken about the location of the property line, damaging another's property because of such a mistake would not be a crime under Ohio law. Absent aggravating factors that do not apply to these circumstances, the elements of a crime are satisfied

under Ohio law only if a person damaging property does it "knowingly," *i.e.*, only if he *knows* it belongs to another person and *knows* he is not protecting his own property against encroachment.

27. After Defendant Caldwell told the Cort's neighbor he could not resolve her dispute with the Corts without a survey establishing the property line, he nevertheless invited her to press criminal charges against Cpl. Cort for damaging the fence and told her he would "take care of" that issue that day. In other words, Caldwell told the neighbor he would pursue a criminal charge against Cpl. Cort for damaging property even though he knew Cpl. Cort, who even the neighbor admitted had a reason to believe the fence in question was on his own property, could not actually be prosecuted.

**C. Defendants Caldwell, Sarver, and Justice Invade the Corts' Property, Refuse to Leave, and Unlawfully Detain Corporal Cort.**

28. Upon leaving the Corts' neighbor's house, Defendant Caldwell met with Defendants Sarver and Justice, who had arrived separately to address the same call for service.

29. Each officer recorded the events described below using body cameras. Relevant portions of Sarver's recording can be accessed at: https://youtu.be/OeQ3kTn7WwQ , and relevant portions of Caldwell's recording can be accessed at: https://youtu.be/rtUGGUSqLmQ .

30. Defendant Caldwell informed Defendants Sarver and Justice that he had dealt with Corporal Cort previously and he was "not a pleasant person," and that when he tried to talk to Cpl. Cort from the fence, "he was like, 'You can stay right there. You're not coming on my yard.' And so we'll we'll see what happens." Caldwell later admitted to the Corts that his prior, unrelated dealing with them was normal and not at all unpleasant.

31. Defendant Caldwell also told Defendants Sarver and Justice that there was an ongoing dispute between the Corts and their neighbor about who owned the property on which the fence stood, with both property owners claiming they owned it.

7

32. Defendant Caldwell described the location of the Corts' house and described it to the Pataskala officers as a "big, big mansion." The Corts' house, which Defendant Caldwell had previously visited, is actually a normal-sized single-family ranch-style home, which the Corts live in with their 11 minor children. As Defendant Caldwell was aware, there are many houses in the vicinity of an equal size or larger.

33. After this brief conversation, and with no attempt to obtain a warrant, Defendants Caldwell, Sarver, and Justice drove from the neighbor's house to the Corts' house. They exited their vehicles, approached the Corts' house, and, without attempting to knock at the front door, simply walked into the side yard, directly adjacent to the house.

34. The officers did not see Cpl. Cort in the side yard. They then walked further onto the Corts' property, following the wall of the house all the way around to the back patio area.

35. The Corts' back patio was a partially paved, secluded area directly behind the house, no part of which was visible from the road or even from the side yard. The patio was encircled by a paved path that allowed Cpl. Cort to use his wheelchair to move in and out of his house and around the part of the Corts' property closest to the house.

36. Upon the officers' entering the back patio area, Cpl. Cort immediately addressed them and instructed them again that they were not welcome on his property and they should leave. Defendants Caldwell, Sarver, and Justice refused to do so.

37. Over the ensuing five minutes, Cpl. Cort audibly asked or instructed Defendants Caldwell, Sarver, and Justice to exit the Corts' property approximately seventy-five times. At first, he did so in a measured tone of voice, but his volume and the intensity of his requests and instructions for the officers to leave both increased as it became clear to Cpl. Cort that the officers would not leave the Corts' property.

38. In the midst of Cpl. Cort's repeated instructions to leave, Defendants Caldwell, Sarver, and Justice ignored the clear, unequivocal indications that they were on the Corts' property without consent and attempted to interrogate Cpl. Cort about the claimed damage to his neighbor's fence. Cpl. Cort clearly and unequivocally refused to answer the officers' questions or engage in any discussion of the fence issue, and he repeated his instruction that they leave.

39. While Cpl. Cort continued to tell the trespassing officers to leave the Corts' property, the officers positioned themselves to surround him physically, with Caldwell on one side and Sarver and Justice blocking the paved path between Cpl. Cort and his house, limiting Cpl. Cort's ability to move toward his house or away from the officers in his wheelchair.

40. After giving further verbal instructions for the officers to leave, which the officers ignored and at times expressly refused, Cpl. Cort understood that the officers had determined not to obey his instructions.

41. All three officers specifically told Cpl. Cort that they were entitled to come onto his property to question him about "his side" of the property line dispute with his neighbors and that he needed to answer their questions. None of these questions related to Cpl. Cort's identity, as Caldwell already knew who he was from their prior meeting. Cpl. Cort made it clear he did not intend to answer any questions and reiterated over and over that the officers needed to leave.

42. After several minutes of the officers refusing to leave and continuing to try to question him against his will about the fence dispute, Cpl. Cort attempted to end the conversation by moving forward on the paved path, between Defendants Sarver and Justice and toward the side of his house. But when Cpl. Cort attempted to wheel forward, Defendant Sarver placed his foot in the path of the right wheel of Cpl. Cort's wheelchair, preventing him from moving forward, knocking his wheelchair off balance, and making it clear that he was not free to leave.

43. Cpl. Cort again tried to go around Defendant Sarver and toward his house, at which point he was blocked by Defendant Justice. Cpl. Cort then used his wheelchair to try to move past Defendant Justice and, when she continued to block him, tried to move past her using his wheelchair and upper body, but she refused to move and let him pass.

44. When Cpl. Cort turned his wheelchair to move back away from Defendants Sarver and Justice and back the other way on the paved path, Defendant Caldwell lifted his foot and placed it on top of the wheel of Cpl. Cort's wheelchair, preventing him from moving at all. Cpl. Cort then used his hands to push Defendant Caldwell's foot off of his chair.

45. At that point, Defendant Caldwell physically grabbed Cpl. Cort and announced that he was under arrest. Defendants Caldwell and Sarver then picked Cpl. Cort's entire body up, took him out of his wheelchair, and forced him to the ground, face-first in the dirt, with each of them placing a knee on top of Cpl. Cort's back.

46. Once Cpl. Cort was lying face-down on the ground, the officers used handcuffs to tightly bind his hands behind his back, with the handcuffs applying extreme, painful pressure to his wrists. They then lifted his entire body up and forced him back into his wheelchair with his hands cuffed behind his back. Cpl. Cort immediately informed the officers that the handcuffs were hurting his wrists, but the Defendants disregarded his expressions of pain.

47. After being handcuffed, Cpl. Cort continued to instruct the officers to leave, and they continued to refuse to do so.

48. As the Defendants' actions unfolded and they continued to ignore Cpl. Cort's demands they leave his property, Cpl. Cort, who has a diagnosed mental health condition arising from his military service, became profoundly disturbed, fearful for himself and his family, and angry at what was happening. As these emotions built, he raised his voice as he continued to

insist the officers leave. He also used profanity, insults, and threats of legal action as the officers' actions became more threatening, especially as the Defendants not only ignored his requests and instructions that they leave, but increasingly blocked his ability to move, surrounded him, removed him from his wheelchair, and placed him under formal arrest and handcuffed him while he was face down on the ground and unable to move. At no time during their interactions did Cpl. Cort engage in injurious or illegal conduct toward the officers.

**D. The Defendants Jail and Charge Cpl. Cort without Cause and Attack His Reputation Using False Written Reports.**

49. With Cpl. Cort still handcuffed and in his wheelchair, Defendant Caldwell excused himself to call Defendant Lorenz, his direct supervisor.

50. When Defendant Caldwell returned, he and Defendants Sarver and Justice placed Cpl. Cort in Caldwell's vehicle and detained him while waiting for Defendant Lorenz to arrive.

51. Defendant Caldwell subsequently had a second call with Defendant Lorenz, and shared with him that he and the Pataskala officers had entered the Corts' property without permission based on their neighbor's complaint about the fence dispute, after which they disregarded repeated instructions from Cpl. Cort to leave.

52. Caldwell then spoke to Sarver and Justice, expressed uncertainty about what they should "do with" Cpl. Cort, and said that Defendant Lorenz would make the final decision.

53. Only after these conversations, approximately half an hour after handcuffing Cpl. Cort, did Defendant Caldwell admit that he knew Cpl. Cort was likely in pain because he had not "double-gapped" his handcuffs, and began speaking to Cpl. Cort about adjusting them. Cpl. Cort asked Defendant Caldwell to remove the cuffs since he had no mobility without his wheelchair, but Defendant Caldwell refused. Defendant Caldwell subsequently loosened the handcuffs.

54. Cpl. Cort was then transported to the Licking County Jail in Newark, Ohio.

11

55. After consulting with Defendant Lorenz, and, upon information and belief, with Defendant Lorenz's instruction and approval, Defendant Caldwell filed false criminal charges against Cpl. Cort of resisting arrest, disorderly conduct, criminal damaging, and failure to provide personal identifying information. There was no probable cause for any of these charges.

56. Cpl. Cort was held in jail for three full days and released the afternoon of October 24, 2022. Because of Cpl. Cort's physical disability and underlying medical conditions as well as the continuing pain in his wrists from the overly tight handcuffing, his jail detention was particularly emotionally and physically taxing and posed needless risks to his long-term health.

57. All of the charges against Cpl. Cort were dismissed on November 16, 2022.

58. In their reports of Cpl. Cort's arrest, the Defendants reported that Cpl. Cort spat water on Defendant Caldwell. This was false, as Cpl. Cort, after being handcuffed but before being placed in Defendant Caldwell's vehicle, was given a small sip of water, which he used to wash out his mouth and spat on the ground to his side. Upon seeing him do this, Defendant Caldwell accused Cpl. Cort of spitting on him, which he had not. The false report, which was included in the Defendants' narratives as a means of attacking Cpl. Cort's reputation and credibility, was later spread widely to the general public through media reporting of the incident.

59. The actions of Defendants Caldwell and Lorenz were caused by the policies and customs of the Licking County Sheriff's Office under the administration of Defendant Thorp, and the training and lack of training provided to them by Defendant Thorp and his office, including a policy and custom of deputies entering the homes, curtilage, and property of county residents without their consent, without a warrant, without probable cause or reasonable suspicion, and against express instruction of the residents whenever the deputies choose to do so to investigate any matter, civil or criminal, as well as improper and/or insufficient training of

deputies in private property rights, constitutional principles of search and seizure, as well as the treatment of individuals with known or suspected physical or mental health disabilities.

60. Following the incident, Defendant Thorp ratified the actions of Defendants Caldwell and Lorenz by refusing to investigate or discipline them for their actions.

61. The actions of Defendants Sarver and Justice were caused by the policies and customs of Defendant City of Pataskala and its Division of Police, and the training and lack of training provided to them by Defendant City of Pataskala. This included a policy and custom of officers entering the homes, curtilage, and property of county residents without their consent, without a warrant, without probable cause or reasonable suspicion, and against express instruction of the residents whenever the officers choose to do so to investigate any matter, civil or criminal. It also included improper and/or insufficient training of deputies in private property rights, constitutional principles of search and seizure, as well as the treatment of individuals with known or suspected physical or mental health disabilities.

62. Following the incident, Chief Brooks of the Pataskala Division of Police, the most senior law enforcement officer for Defendant City of Pataskala, ratified the actions of Defendants Sarver and Justice by refusing to investigate or discipline them for their actions and by affirmatively telling the Corts, in a telephone conversation, that his officers' actions were consistent with their training and the policies and procedures of his division.

63. The actions of the Defendants at all times were wanton, willful, reckless, in bad faith and in knowing violation of the Plaintiffs' rights.

64. The actions of the Defendants have caused Plaintiff Melroy Cort physical injury and loss of liberty and caused both Cpl. Cort and Plaintiff Samantha Cort anxiety, anger, humiliation, and stress, as well as reputational damage.

65. Virtually all of the actions above took place in view of the Plaintiffs' minor children, causing them particularly intense humiliation, stress, and fear for their family's safety.

## V. CLAIMS FOR RELIEF

### A. FEDERAL CLAIMS FOR RELIEF: VIOLATION OF CIVIL RIGHTS UNDER THE FOURTH AND FOURTEENTH AMENDMENTS

66. The above paragraphs are hereby incorporated and re-alleged.

67. The actions of the Defendants violated the Fourth and Fourteenth Amendments to the United States Constitution, which are actionable against them pursuant to 42 U.S.C. § 1983.

68. The actions of the Defendants caused Plaintiff Melroy Cort to be arrested without probable cause in violation of his Fourth and Fourteenth Amendment rights.

69. The actions of the Defendants caused Plaintiff Melroy Cort to be prosecuted without probable cause, which directly caused him to be deprived of liberty.

70. The actions of the Defendants violated the rights of Plaintiffs Melroy and Samantha Cort by intruding on and occupying their constitutionally protected property, including the curtilage of their home, in violation of their Fourth and Fourteenth Amendment rights.

### B. STATE CLAIMS FOR RELIEF

*First State Claim for Relief: Battery*

71. The above paragraphs are hereby incorporated and re-alleged.

72. The seizing, handcuffing, and arresting of Plaintiff Melroy Cort by Defendants Caldwell, Sarver, and Justice without his consent constituted a battery.

*Second State Claim for Relief: False Arrest and Imprisonment*

73. The above paragraphs are hereby incorporated and re-alleged.

74. The arrest and handcuffing of Plaintiff Melroy Cort by Defendants Thorp, Caldwell, Lorenz, Sarver, and Justice constituted false arrest and false imprisonment.

### *Third State Claim for Relief:  Malicious Prosecution*

75. The above paragraphs are hereby incorporated and re-alleged.

76. The filing of criminal charges against Plaintiff Melroy Cort by Defendants Thorp, Caldwell, Lorenz, Sarver, and Justice without probable cause and with malice constituted malicious prosecution.

### *Fourth State Claim for Relief:  Defamation*

77. The above paragraphs are hereby incorporated and re-alleged.

78. The statements of Defendants Caldwell, Sarver, and Justice reporting that Plaintiff Melroy Cort spat on them and assaulted them, which they knew were false and/or as to which they recklessly disregarded their falsity, and thereby subjected Cpl. Cort to public hatred, contempt, ridicule, shame, and disgrace, constituted defamation *per se*.

### *Fifth State Claim for Relief:  Civil Trespass*

79. The above paragraphs are hereby incorporated and re-alleged.

80. The actions of Defendants Thorp, Caldwell, Lorenz, Sarver, and Justice in entering the Corts' property without consent or privilege to do so and remaining against the the Corts' express directions to leave constituted a trespass for which they are liable to the Plaintiffs.

### *Sixth State Claim for Relief:  Criminal Conduct*

81. The above paragraphs are hereby incorporated and re-alleged.

82. The actions of Defendants Thorp, Caldwell, Lorenz, Sarver, and Justice described above violated Ohio Revised Code Section 2921.45, which makes it a crime for Ohio public servants to knowingly deprive, conspire, or attempt to deprive any person of a constitutional or statutory right; Section 2921.13(A)(2), which makes it a crime for any person to knowingly make a false statement or swear or affirm to the truth of a previously made false statement with

purpose to incriminate another; and Section 2911.21, which makes it a crime to criminally trespass on another person's property by entering or remaining on the property without privilege to do so.  Such criminal conduct is actionable by the Plaintiffs against the Defendants pursuant to Section 2307.60 of the Ohio Revised Code.

## VI. PRAYER FOR RELIEF

83. **WHEREFORE,** the Plaintiffs ask for judgment against the Defendants and requests compensatory and punitive damages in an amount to be determined at trial; the costs of this action, including reasonable attorney's fees; and any other relief the Court deems appropriate.

Respectfully Submitted,

/s/Frederick M. Gittes\
Frederick M. Gittes (0031444)\
fgittes@gitteslaw.com\
Jeffrey P. Vardaro (0081819)\
jvardaro@gitteslaw.com\
The Gittes Law Group\
723 Oak St.\
Columbus, OH 43205\
(614) 222-4735\
Fax: (614) 221-9655\
Attorneys for Plaintiffs

## JURY DEMAND

The Plaintiffs hereby demand a jury of eight (8) to determine all issues triable by jury in this matter.

/s/Frederick M. Gittes\
Frederick M. Gittes (0031444)