# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**MELROY CORT,** *et al.,*

              **Plaintiffs,**       :

                                      **Case No. 2:23-cv-917**

        **v.**                           **Chief Judge Sarah D. Morrison**

                                        **Magistrate Judge Elizabeth A. Preston Deavers**

**SHERIFF RANDY THORP,** *et al.,*   :

              **Defendants.**

## OPINION AND ORDER

The facts giving rise to this suit are captured on video. The video is difficult to watch, but it leaves no room for doubt: Pataskala Police Officers Zachary Sarver and Johnessa Justice violated the constitutional rights of Corporal Melroy Cort and Samantha Cort.

On October 21, 2022, Licking County Deputy Sheriff Alex Caldwell, Officer Sarver, and Officer Justice walked into the Corts' backyard, without a warrant, to investigate a property dispute. The Officers encountered Cpl. Cort, who lost his legs when deployed to Iraq with the Marine Corps and relies on a wheelchair to ambulate. Cpl. Cort asked the Officers to leave—over, and over, and over again. As the minutes passed, Cpl. Cort grew increasingly frustrated and his pleas grew increasingly desperate. The Officers stood, silent and unmoving, on the paved path clearly intended for Cpl. Cort's wheelchair to safely travel between his home and his yard. When Cpl. Cort tried to move past them, the Officers did not step out of his

way—they stepped into it. A struggle ensued, as Cpl. Cort tried again to pass the Officers. Then, Deputy Caldwell and Officer Sarver reached under Cpl. Cort's shoulders and lifted him out of his wheelchair. They put him face-down in the grass and, with their knees on his back, handcuffed the already-immobile Cpl. Cort and placed him under arrest for assaulting a peace officer.

The Corts filed suit alleging violations of the Fourth Amendment and Ohio law. The matter is now before the Court on the parties' cross-Motions for Summary Judgment. For the reasons below, the Corts' Motion (ECF No. 47) is **GRANTED in part** and **DENIED in part**. The Pataskala Defendants' Motion (ECF No. 49) is **DENIED**.

## I.      STATEMENT OF FACTS

### A.      The Officers responded to a call from the Corts' neighbor.

Shortly after 4:00p.m. on October 21, 2022, Deputy Caldwell responded to a report of property damage. The caller, Eleanor White, told Deputy Caldwell that her neighbor (later discovered to be Cpl. Cort) had damaged her back fence with a bulldozer. Ms. White explained to Deputy Caldwell:

> I had an officer out here about a month or so ago. The guy that lives in that house up there on Shannon, the new one, he thinks he owns everything. . . . He's out here tearing the fence down because he says "I own all of this." He thinks he owns it because he's got an aerial view [map].

(Caldwell Bodycam, Ex. 6, 3:15.[1]) Deputy Caldwell walked into Ms. White's backyard to evaluate the alleged damage. While there, Cpl. Cort came into view. (*Id.*, 4:10.) Deputy Caldwell yelled out that he wanted to have a conversation with Cpl. Cort, but the distance was too great, so Caldwell said, "Just hang on one second, I'll come around." (*Id.*, 4:15.) Cpl. Cort responded, "No, you can stay right there on that property." (*Id.*)

Deputy Caldwell went back into Ms. White's house and re-engaged Ms. White in conversation. He ultimately advised her that he could not "dispute the land without a survey," but that he could "definitely do something about" the property damage. (*Id.*, 8:28.) Ms. White admitted that she did not have a survey of her land, and warned Deputy Caldwell to "watch out" because Cpl. Cort had "an arsenal of weapons[.]" (*Id.*, 4:40.)

When Officers Sarver and Justice arrived, Deputy Caldwell filled them in:

I've dealt with this guy a couple times. He's not a pleasant person. I tried talking to him over the fence, he wouldn't come over to the fence. He was like, "You can stay right there, you're not coming on my yard." So, we'll see what happens. . . .

He like damaged two slats on the back fence with a bulldozer. He's clearing out all those properties back there. He's saying that they're his, they say they own part of that. It's been a dispute going on for a while. But he hit a fence with a bulldozer today and they want charges.

(*Id.*, 11:00.)

---

[1] Video footage from Mrs. Cort's iPhone and Deputy Caldwell, Officer Sarver, and Officer Justice's body-worn cameras was manually filed with the Court. (*See* ECF No. 46.) All time-stamps are approximate.

**B.** **The Officers went to the Corts' house.**

The Officers got in their cruisers and drove the short distance to the Corts' residence, parking in the Corts' driveway, behind the family SUV. (*Id.*, 13:50.) The home is situated to the right of the driveway, with the driveway leading to an attached garage. (*Id.*, 14:05.) A paved walkway extends off either side of the drive—the right-hand path leads to the front door, and the left-hand path leads to the backyard:



(*Id.*) Opting for the left-hand path, Deputy Caldwell said, "They were just out back, so . . . ." (*Id.*, 14:22.)

The path's border was neatly landscaped with foliage screens.



(*Id.*, 14:24.) The Officers walked within feet of the home's Northeast corner, along the East wall, and around the Southeast corner, bringing a gated patio and garden beds into view. (*Id.*; *see also* Melroy Cort Decl., ECF 47-2, ¶¶ 6–9.)

Cpl. Cort approached the Officers asking, "So, you took it upon yourself to come onto my property anyway?" (Caldwell Bodycam, 14:55.) The Corts and the Officers met on the walkway next to garden beds. (*Id.*)

Over the next three minutes and thirty-five seconds, Cpl. Cort asked the Officers to leave no fewer than sixty times. The Officers ignored Cpl. Cort's requests, which quickly evolved into demands:

> **Cort**: Would you please exit my property?
> **Caldwell**: Alright, so we got. . .
> **Cort**: Could you please exit my property now?
> **Caldwell**: If we go back over to the driveway, would you talk with me?
> **Cort**: No; get off my property.
> **Caldwell**: So, we received a . . .
> **Cort**: Get off of my property, I do not want to speak to you.

(*Id.*, 14:57.)

Officer Sarver eventually told Cpl. Cort, "They got a call about a criminal complaint, he's following up with it. So, you need to speak to the Deputy about what happened." (*Id.*, 16:30.) Cpl. Cort argued with Officer Sarver about whether the Constitution required him to do so. (*Id.*, 16:45.) He also approached each Officer to address their body-worn camera, using his arms to lift himself off the seat of his chair to say things like, "The bodycam has shown that you refused to get off my property." (Sarver Bodycam, Ex. 26, 8:03.) During this exchange, Officer Justice stood on the walkway; Officer Sarver shifted between the walkway and the grass; and Deputy Caldwell stood on the grass just off the walkway.



(*See, e.g.,* Caldwell Bodycam, 17:46.) Throughout, the Officers remained in their relative positions and made no attempt to exit the Corts' property.

Cpl. Cort approached Officer Justice and yelled into her bodycam, "Get off my property, Ma'am. Get off my property, Ma'am. Get off my property, Ma'am," while Officer Justice stood motionless, diverting her gaze from Cpl. Cort. (*Id.*, 18:07.) At the same time, Officer Sarver stayed nearby to Cpl. Cort's right, and Deputy Caldwell continued to talk about Ms. White's fence.



(*Id.*, 18:08.)

But then Officer Justice decided to engage, dramatically changing the course of the interaction, yelling, "You're going to back up out of my face because this is not how this is gonna go. This is not how this is gonna go." (*Id.*, 18:13.) Officer Sarver closed in; so did Deputy Caldwell.



(*Id.*, 18:18; *see also* iPhone Camera, Ex. 37, 2:43.) Cpl. Cort and Officer Sarver

began arguing at close-range.

> **Sarver**: Back up. Back up.
> **Cort**: Do you want me to defend myself?
> **Sarver**: I want you to back up.

(iPhone Camera, 2:45.) Officer Justice continued to yell, "This is what happens is

that we come over and get your side of the story just like we went over and got her

side of the story." (*Id.*, 2:50.)

Cpl. Cort tried to move forward, but Officer Sarver stuck out his foot and stopped Cpl. Cort's front wheel, saying "Back up." (*Id.*, 2:52.) Cpl. Cort rolled backwards, turned to Mrs. Cort, and said, "Did you see that?" (*Id.*) Officer Sarver's foot remained in a heel-propped position:



(*Id.*, 2:56.) Cpl. Cort attempted to move forward again and said, "Excuse me, please." (*Id.*) Officer Sarver responded, "You gonna run me over?" (*Id.*) A scrum broke out, but none of the cameras at the scene steadily captured the event.

After several moments of struggle, Officer Sarver and Deputy Caldwell grabbed Cpl. Cort's arms and lifted him from his wheelchair. (Justice Bodycam, Ex. 28, 5:41.) They put Cpl. Cort face-down on the grass and handcuffed him. (Caldwell Bodycam, 19:35.) Deputy Caldwell advised Cpl. Cort that he was under arrest for assault on a police officer. (*Id.*, 20:24.)

**C.      Deputy Caldwell filed charges with the Licking County Prosecutor's Office.**

Cpl. Cort was transported to the Licking County jail, where he was held for three days. Officers Sarver and Justice provided written statements to Deputy Caldwell. (ECF No. 36-16, PAGEID # 825.) Deputy Caldwell recommended, and the Licking County Prosecutor's Office filed, several charges against Cpl. Cort: Criminal Damaging (F4); Obstructing Official Business (M2); Failure to Disclose Personal Information (M4); and Resisting Arrest (M2). (*See* ECF No. 36-11, PAGEID # 804.) Deputy Caldwell testified that he did not consult Officers Sarver and Justice about the charges before filing them. (Caldwell Dep., ECF No. 36-1, 92:21–22.) But Officer Justice testified that the three had a fifteen-minute long, in-person meeting at a Pataskala Police Station to discuss the incident. (Justice Dep., ECF No. 36-7, 60:21–61:13.)

Within three weeks, the charges against Cpl. Cort were dismissed. (*See Ohio v. Cort*, 22CRB01667 (Licking Cty. Mun. Ct., dismissal entry filed Nov. 16, 2022).)

**D.      The Corts filed this suit.**

In March 2023, the Corts filed this action against Deputy Caldwell and his superiors in the Licking County Sheriff's Office (the "Licking County Defendants"), and Officer Sarver, Officer Justice, and the City of Pataskala (the "Pataskala Defendants"). (Compl., ECF No. 1.) The Licking County Defendants were dismissed on October 3, 2024. (ECF No. 35.) The following claims remain against the Pataskala Defendants:

- <u>Count One</u>: Section 1983, Fourth Amendment (Sarver, Justice, City)
- <u>Count Two</u>: Battery (Sarver, Justice)

10

- <u>Count Three</u>: False Arrest (Sarver, Justice)
- <u>Count Four</u>: Malicious Prosecution (Sarver, Justice)
- <u>Count Five</u>: Defamation (Sarver, Justice)
- <u>Count Six</u>: Civil Trespass (Sarver, Justice)
- <u>Count Seven</u>: Criminal Conduct (Sarver, Justice)

(Compl.) The Corts and the Pataskala Defendants both move for summary

judgment.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine

issues of material fact, which may be achieved by demonstrating the nonmoving

party lacks evidence to support an essential element of its claim. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*,

12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving

party to "set forth specific facts showing that there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P.

56). When evaluating a motion for summary judgment, the evidence must be viewed

in the light most favorable to the non-moving party.[2] *Adickes v. S.H. Kress & Co.*,

398 U.S. 144, 157 (1970).

---

[2] On cross-motions for summary judgment, like those *sub judice*, courts
perform a "hat switch"—in reviewing the *defendant's* motion, the court accepts
*plaintiff's* view of the facts as true and draws all reasonable inferences in favor of
the *plaintiff*; but in review of the *plaintiff's* motion, the court accepts the *defendant's*
view of the facts and draws all reasonable inferences in favor of the *defendant*.
*Harris v. City of Saginaw, Mich.*, 62 F.4th 1028, 1032–33 (6th Cir. 2023).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## III.     ANALYSIS

### A.     Officers Sarver and Justice are liable to the Corts for unreasonable search and seizure.

The Corts first assert that Officers Sarver and Justice violated their Fourth Amendment rights. (Compl., ¶¶ 66–70 (citing 42 U.S.C. § 1983).) The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. The Corts' claim has four sub-parts: first, that the Officers invaded the curtilage of their home without a warrant; second, that the Officers detained Cpl. Cort without reasonable suspicion; third, that the Officers arrested Cpl. Cort without probable cause; and fourth, that the Officers maliciously prosecuted Cpl. Cort. The Court will address each sub-part in turn.

### 1.     The Officers are liable for invasion of the Corts' property.

One's home is at the "very core" of the spaces protected against government intrusion. *Florida v. Jardines*, 569 U.S. 1, 6, (2013) (quoting *Silverman v. United*

12

*States*, 365 U.S. 505, 511 (1961)). For Fourth Amendment purposes, "the area immediately surrounding and associated with the home" (referred to as the "curtilage") is considered part of the home. *Id.* (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). "When a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred." *Collins v. Virginia*, 584 U.S. 586, 593 (2018) (citing *Jardines*, 569 U.S. at 11). A warrantless search of constitutionally protected property is *per se* unreasonable "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). Here, neither of the Officers obtained a warrant before entering the Corts' property. The question thus becomes whether the area they traversed was curtilage and whether there was any applicable warrant exception. The Court finds that it was, and there wasn't.

> **a)** **The Officers invaded the curtilage of the Corts' home to investigate the neighbor's complaint.**

A scope-of-curtilage inquiry is at once "commonsense," *Morgan v. Fairfield Cnty.*, 903 F.3d 553, 561 (6th Cir. 2018) (citing *Jardines*, 569 U.S. at 7), "general[ly] complex[]," *Daughenbaugh v. Tiffin*, 150 F.3d 594, 603 (6th Cir. 1993), and "fact-intensive," *Morgan.*, 903 F.3d at 561. Although the Supreme Court has identified four factors to aid a court's analysis, it cautions against their "mechanical application." *United States v. Dunn*, 480 U.S. 294, 301 (1987). Looking to those factors with a focus on whether the space is "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment

protection," *id.*, the Court is compelled to find that Officers Sarver and Justice invaded the curtilage of the Corts' home.

The first factor is "the proximity of the area . . . to the home." *Id.* The Officers followed a paved path to the eventual point of their confrontation with Cpl. Cort. The path brings the Officers within feet of the home's Northeast corner and immediately next to the raised garden beds bordering the home's gated back patio. It could hardly be more proximate to the home.

The second factor is "whether the area is included within an enclosure surrounding the home." *Id.* The Officers argue that the path they walked on was not "fenced in or otherwise enclosed." (ECF No. 52, PAGEID # 2058–59.) But the law does not require an artificial enclosure. *Daughenbaugh*, 150 F.3d at 599. The path is neatly landscaped on both sides, with closely spaced coniferous trees forming a screen along the outer border of the path.

The third factor asks the Court to consider the area's use. *Dunn*, 480 U.S. at 301. The paved path is clearly intended as a means for Cpl. Cort to safely traverse the space around his home:



(ECF No. 41-2, PAGEID # 1368.) And in the back of the house, the only buffer between the path and the patio is a row of raised garden beds. All of this made plain that the space was one where private moments of family life were meant to be enjoyed. *See Collins*, 584 U.S. at 593–94 (including a "side garden" in a list of areas "properly considered curtilage"); *United States v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997) (finding gardening to be among "the intimate activities normally associated with the home").

Finally, the Court considers "the steps taken . . . to protect the area from observation by people passing by." *Dunn*, 480 U.S. at 301. The tree screen blocked the path from the view of any passersby. And the raised beds that became a backdrop to the confrontation only came into view when the Officers came around to the back of the house; they were not visible from the driveway.

The area traversed and occupied by the Officers on the Corts' property was within the constitutionally protected curtilage of the home. *Accord Daughenbaugh*,

150 F.3d at 603 (noting that "the law seems relatively unambiguous that a backyard abutting the home constitutes curtilage and receives constitutional protection"). Unless an exception applies, this warrantless invasion is an unlawful search.

> **b)** **The Officers operated without a warrant, but no exception to the warrant requirement applied.**

The Officers argue that they were properly on the Corts' property under the knock-and-talk and officer-safety exceptions to the warrant requirement. They were not.

"A 'knock and talk' is an investigative technique in which police, without a warrant, knock on a suspect's door and ask to speak with the suspect or for consent to search." *Morgan*, 903 F.3d at 558 n.1. A knock-and-talk allows law enforcement to do what any other visitor can do: "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 U.S. at 8; *see also Watson v. Pearson*, 928 F.3d 507, 512 (6th Cir. 2019) (explaining that a knock-and-talk "allows an officer without a warrant to enter the curtilage and knock on the front door"). From the first, the Officers failed to adhere to "the terms of th[is] traditional invitation." *Jardines*, at 8. The path to the Corts' front door extends off the right-side of the driveway; the Officers took the path extending off the left-side. They did not approach the front door, and so they did not knock. They met Cpl. Cort in his backyard where he made clear that he would not voluntarily answer the Officers' questions and told them to leave. At that point, the Officers were required by law to leave. They did not.

The Officers also argue that their continued presence was necessary to ensure officer safety. "To be sure, officer safety can be an exigency justifying warrantless entry." *Morgan*, 903 F.3d at 562. But no such exigency existed here.[3] By the Officers' own account, almost three minutes passed before they perceived any threat at all. (*See* ECF No. 49, PAGEID # 1569.) There can be no dispute about what transpired in those three minutes: Cpl. Cort directed the Officers, unambiguously and repeatedly, to get out of his backyard. The Officers ignored his entreaties. Armed and outfitted in tactical gear, they stood their ground (which was, in reality, *the Corts'* ground) and boasted a legal right to do so—for minutes. What were the Corts to do, "call the police"? No; "the Bill of Rights exists to protect people from the power of the government[.]" *Morgan*, 903 F.3d at 563. The Officers cannot use a threat arising in reaction to their own unlawful conduct to shield themselves from accountability for further unlawful conduct. *Cf. Kentucky v. King*, 563 U.S. 452, 462 (2011) (allowing warrantless entry based on exigency when "the police did not create the exigency by engaging . . . in conduct that violates the Fourth Amendment").

To the extent the Corts' § 1983 claim against Officers Sarver and Justice is based on the invasion of the curtilage of their home without a warrant, judgment is **GRANTED** in favor of the Corts.

---

[3] The Officers note that they were "warned" the Corts had "an arsenal." It is well established that "the mere presence of firearms does not create exigent circumstances." *Morgan*, 903 F.3d at 562 (internal quotation, citation, and alteration omitted).

### 2. The Officers are liable for the unlawful detention and arrest of Cpl. Cort.

Cpl. Cort next asserts that the Officers unlawfully seized his person. The parties agree that Cpl. Cort was, at some point, seized—but they disagree about when the seizure occurred. Cpl. Cort argues that he was seized when Officer Sarver told him he had to answer Deputy Caldwell's questions. The Officers argue that Cpl. Cort was not seized until he was handcuffed. As to the time of his seizure, the undisputable facts compel the Court to agree with Cpl. Cort.

### a) Cpl. Cort was seized when Officer Sarver told him he needed to speak to Deputy Caldwell.

A seizure occurs, for Fourth Amendment purposes, when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of" another. *United States v. Mendenhall*, 446 U.S. 544, 552 (1980) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16). One's liberty is restrained when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554. The Sixth Circuit has long recognized "that words alone may be enough to make a reasonable person feel that he would not be free to leave." *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004); *accord Mendenhall*, 446 at 554–55 (listing, as one example of circumstances indicative of a seizure, "the use of language or tone of voice indicating that compliance with the officer's request might be compelled").

Here, Cpl. Cort met the uniformed and armed Officers on the path behind his home and asked them to exit his property. He and Deputy Caldwell began talking over one another—while Deputy Caldwell tried to investigate damage to the fence,

Cpl. Cort asked the Officers to leave. The Officers refused to leave. Instead, they asked Cpl. Cort whether he would be willing to speak in the driveway or to Officer Sarver. When Cpl. Cort rejected both proposals, Officer Sarver said:

> They got a call about a criminal complaint; he's following up with it. So, you need to speak to the Deputy about what happened.

(Ex. 26, 7:20.) At that point, no reasonable person would have believed they were free to leave.

### b) The Officers lacked reasonable suspicion to believe that Cpl. Cort had committed a crime.

Having concluded that the Officers seized Cpl. Cort's person when Officer Sarver told him he needed to speak to Deputy Caldwell, the Court now asks whether the seizure was lawful. The parties agree that this stage of the encounter was a *Terry* stop. *Terry* allows a brief investigative detention "if the officer has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). "Reasonable suspicion exists when, based on the totality of the circumstances, a police officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Bey v. Falk*, 946 F.3d 304, 313 (6th Cir. 2019) (quoting *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011)). Although an officer's "inchoate and unparticularized suspicion[s]" are not to be given weight, courts should consider "the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27.

19

The Officers assert that they had reasonable suspicion to believe that Cpl. Cort committed criminal damaging to his neighbor's fence. Cpl. Cort argues that the Officers could not have had reasonable suspicion that he committed criminal damaging because the Officers knew he believed the fence was on his land.

Ohio law makes it a crime to knowingly "cause, or create a substantial risk of[,] physical harm to any property of another without the other person's consent[.]" Ohio Rev. Code § 2909.06(A)(1). While they were still at Ms. White's house, Deputy Caldwell told Officer Sarver and Officer Justice that Ms. White's complaint was the latest in a border dispute that had been "going on for a while," and that Cpl. Cort believed the fence was on his property. Thus, based on the information known to the Officers, Cpl. Cort could not have knowingly damaged another's property—at most, he either knowingly damaged his own property, or _un_knowingly damaged another's.[4] The Officers lacked an objective basis for suspecting Cpl. Cort of criminal activity, rendering their investigative detention unlawful.

### c) Cpl. Cort was arrested when Officer Sarver put his boot on Cpl. Cort's wheelchair.

Cpl. Cort asserts that he was also subjected to an unlawful arrest. It is beyond dispute that "[t]he police must have probable cause to believe that the person has committed or is committing a crime to make a lawful warrantless arrest." *United States v. Richardson*, 949 F.2d 851, 858 (6th Cir. 1991). And it is undisputed that Cpl. Cort was, at some point, arrested. But again, the parties

---

[4] Ohio law permits a landowner to "to use self-help to remove encroachments on his property," so long as he acts with reasonable care. *State v. Schwendeman*, 104 N.E.3d 44, 49 (Ohio Ct. App. 2018).

cannot agree on when it occurred. The Officers argue that Cpl. Cort was arrested when they placed him in handcuffs—after the physical struggle established probable cause to believe he had assaulted a police officer. *See* Ohio Rev. Code § 2903.13(C)(5)(a). Cpl. Cort argues that his arrest was complete the moment the Officers overstepped the boundaries of a permissible *Terry* stop without probable cause.

"When actions by police exceed the bounds permitted by reasonable suspicion, [a] seizure becomes an arrest[.]" *Richardson*, 949 F.2d at 856 (quoting *Dunaway v. New York*, 442 U.S. 200, 207 (1979)). But there is no "litmus test to determine when a *Terry* stop becomes an arrest." *Id.* (citing *Florida v. Royer*, 460 U.S. 491, 502 (1983) (plurality opinion)). Instead, courts must make a case-by-case inquiry into "nature of the restraints placed on an individual's liberty." *Id.* Courts within the Sixth Circuit consider the following three factors to distinguish a *Terry* stop from an arrest: (1) the conduct of the police; (2) the characteristics of the citizen; and (3) the physical surroundings of the encounter. *United States v. Grant*, 920 F.2d 376 (6th Cir. 1990). Still, the inquiry is an objective one and so focuses on whether "a reasonable person in the [citizen's] position would have felt that he was under arrest or was otherwise deprived of his freedom of action in any significant way." *United States v. Knox*, 839 F.2d 285, 291 (6th Cir. 1988) (internal quotation and citation omitted).

Here, the Officers stood on the paved path behind the Corts' home, between Cpl. Cort and his driveway. Cpl. Cort relied on a wheelchair to travel around his

21

home because both of his legs had been amputated above the knee. As Cpl. Cort tried to move forward on the path, Officer Sarver picked up his foot and put it on the front wheel of the wheelchair, preventing Cpl. Cort from moving forward.[5] A reasonable jury could only conclude that, in that moment, Cpl. Cort's arrest was complete.[6] That arrest was unsupported by probable cause because the alleged assault had not yet occurred; it therefore violated Cpl. Cort's Fourth Amendment rights.

*          *          *

To the extent the Corts' § 1983 claim against Officers Sarver and Justice is based on the unlawful seizure of Cpl. Cort's person, judgment is **GRANTED** in favor of the Corts.

### B.    Genuine issues of material fact preclude summary judgment on Cpl. Cort's malicious prosecution claim.

Cpl. Cort next asserts a claim for malicious prosecution, in violation of the Fourth Amendment. To succeed on such a claim, a plaintiff must prove four elements. First, "that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute."

---

[5] The Officers argue that Cpl. Cort was not deprived of his liberty because the paved path extended behind him and led to a basement door. In their view, Cpl. Cort could have retreated into his home by turning around on the path. But an arrest does not require complete incapacitation; it requires only a significant deprivation of freedom of action. *Knox*, 839 F.2d at 291.

[6] Officer Justice argues that she cannot be liable for unlawful arrest because she did not effect the arrest. But liability can also attach to a non-arresting officer who did not intervene when she had "reason to question whether probable cause existed[.]" *Harris*, 62 F.4th at 1036.

*Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (cleaned up). Second, "that there was a lack of probable cause for the criminal prosecution[.]" *Id*. Third, that the plaintiff suffered a deprivation of liberty as a consequence of the legal proceeding, apart from the initial seizure. *Id*. at 108–09. And fourth, that the criminal proceeding resolved in the plaintiff's favor. *Id*. at 109. Only the first element is at issue here.

The parties dispute whether the Officers "made, influenced, or participated in the decision" to charge Cpl. Cort. On this point, the Sixth Circuit has clarified:

> "Under the first element, an investigating officer does not escape liability just because someone else (e.g., the prosecutor) made the actual decision to prosecute, so long as the plaintiff can show that the officer influenced or participated in the decision to prosecute." "Providing reports, affidavits, or other investigative materials containing falsehoods, omissions, or misstatements to a prosecutor can constitute participation when (1) those materials formed the basis for the charge," and "(2) the falsehoods, omissions, or misstatements were made deliberately or with reckless disregard for the truth."

*Tlapanco v. Elges*, 969 F.3d 638, 655 (6th Cir. 2020) (quoting *Sampson v. Village of Mackinaw City*, 685 F. App'x 407, 417 (6th Cir. 2017) (internal quotation omitted) and *Meeks v. City of Detroit*, 727 F. App'x 171, 178 (6th Cir. 2018)). The Officers argue that the charging decision was made by Licking County officials. Cpl. Cort counters that Officer Justice testified that she and Officer Sarver discussed the charges with Deputy Caldwell before they were filed, and that the Officers' statements contained falsehoods that formed the basis of the charges—namely, that Cpl. Cort assaulted the Officers with his wheelchair and spit water on Deputy Caldwell. These constitute genuine issues of material fact that must be resolved by a jury.

Thus, to the extent the Corts' § 1983 claim against Officers Sarver and Justice is based on the malicious prosecution of Cpl. Cort, summary judgment is **DENIED**.

### C. Genuine issues of material fact preclude summary judgment against the City of Pataskala.

The Corts also assert constitutional claims against the City of Pataskala. But § 1983 does not "incorporate doctrines of vicarious liability." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). Accordingly, "[a] plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). "A plaintiff asserting a section 1983 claim on the basis of a municipal custom or policy must 'identify the policy, connect the policy to the [City] itself and show that the particular injury was incurred because of the execution of that policy.'" *Graham v. Cty. of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) (quoting *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993), cert. denied, 510 U.S. 1177 (1994)). "There must be a direct causal link between the policy and the alleged constitutional violation." *Id.* (internal quotation and citation omitted). In other words, the plaintiff must show that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 879–80 (6th Cir. 2020) (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)).

A municipal policy or custom may be proved by four methods: (1) an official policy or legislative enactment; (2) ratification of illegal acts by an official with final decision-making authority; (3) inadequate training or supervision; or (4) a custom of tolerance or acquiescence of constitutional violations. *See Burgess*, 735 F.3d at 478 (citation omitted). Pataskala argues that the Corts fail to present evidence sufficient for a reasonable jury to find in their favor. As to the ratification theory, the Court disagrees.

Under the ratification theory of *Monell* liability, if a municipal officer with final decision-making authority "approve[s] a subordinate's decision and the basis for it, [the] ratification would be chargeable to the municipality[.]" *City of St. Louis v. Prapotnik*, 485 U.S. 112, 127 (1988). "Ratification of a subordinate's action requires more than acquiescence—it requires affirmative approval of a particular decision made by a subordinate." *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) (citation omitted). Even if it is shown that a municipality subsequently ratified a decision, a plaintiff must still "prove that the ratification was a 'moving force' in causing the constitutional violation." *Id*. at 656 n.6 (quoting *Williams v. Ellington*, 936 F.2d 881, 885 (6th Cir. 1991)).

In a sworn affidavit submitted in support of the Pataskala Defendants' Motion for Summary Judgment, Pataskala Chief of Police Bruce Brooks affirmatively approved the Officers' conduct on October 21, 2022, and admitted that his decision on the matter was final. (*See* Brooks Aff., ECF No. 49-5, ¶¶ 23–26.) But neither party addresses, or puts forth evidence establishing, whether Chief Brooks's

25

post-incident ratification was a moving force behind Cpl. Cort's injury. This question must also be put to a jury.

### D.     State Law Claims

The Officers next argue that they enjoy statutory immunity from the Corts' state law claims. "Ohio provides statutory immunity from suit to its police officers unless, among other things, the officer's 'acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner.'" *Stewart v. City of Euclid, Ohio*, 907 F.3d 667, 676 (6th Cir. 2020) (quoting Ohio Rev. Code § 2744.03(A)(6)(b)). "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson v. Massillon*, 983 N.E.2d 266, 388 (Ohio 2012). Meanwhile, "[r]eckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id*. The Sixth Circuit has held that "officers act in a 'wanton or reckless' manner when they violate an individual's clearly established constitutional rights." *Heeter v. Bowers*, 99 F.4th 900, 922 (6th Cir. 2024) (further citation omitted).

The Court has already concluded that the Officers violated the Corts' Fourth Amendment rights against unreasonable search of property, detention without reasonable suspicion, and arrest without probable cause. Those federal claims correspond to the State law claims of false arrest and trespass. Thus, as to those claims, the Officers are not entitled to statutory immunity.

26

###### 1. Battery

Cpl. Cort first asserts a claim for civil battery against the Officers. "A person is subject to liability for battery when he acts intending to cause a harmful or offensive contact, and when a harmful contact results." *Love v. City of Port Clinton*, 524 N.E.2d 166, 167 (Ohio 1988) (citing Restatement (Second) of Torts, § 13 (A.L.I. 1965)). When not privileged, handcuffing "plainly" constitutes a battery. *Id.* Whether Officer Sarver was privileged in handcuffing Cpl. Cort turns on whether Cpl. Cort assaulted the Officers with his wheelchair. Even though he was under unlawful arrest, Cpl. Cort was not privileged to assault the Officers. *Cf. City of Columbus v. Fraley*, 324 N.E.2d 735, 736 (syllabus) (Ohio 1975) ("In the absence of excessive or unnecessary force by an arresting officer, a private citizen may not use force to resist arrest by one he knows, or has good reason to believe, is an authorized police officer engaged in the performance of his duties, whether or not the arrest is illegal under the circumstances."). So, if Cpl. Cort did "ram" the Officers with his wheelchair at some point before he was handcuffed, the handcuffing itself may have been privileged contact. Neither the testimony nor the video evidence in the record clearly establishes whether Cpl. Cort "rammed" the Officers with his wheelchair. The question must be submitted to a jury.

###### 2. False Arrest

Cpl. Cort next asserts a state law claim for false arrest. "The essence of the tort of false arrest is the depriving of a person of his or her liberty without lawful justification. Specifically, a plaintiff must show only that he or she was detained and that the detention was unlawful." *Thacker v. City of Columbus*, 328 F.3d 244,

261 (6th Cir. 2003) (quoting *Tucker v. Kroger Co.*, 726 N.E.2d 1111, 1115 (Ohio Ct. App. 1999)). The Court has already concluded that the Officers arrested Cpl. Cort without probable cause. Thus, summary judgment on the state law counterpart is **GRANTED** to Cpl. Cort.

### 3. Malicious Prosecution

Under Ohio law, the elements of a malicious prosecution claim are "(1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the defendant." *Rogers v. Barbera*, 164 N.E.2d 162, 163 (syllabus) (Ohio 1960). Despite appearances, the first element does not require a showing of subjective malice—instead, "if the lack of probable cause is demonstrated, 'the legal inference may be drawn that the proceedings were actuated by malice.'" *Thacker v. City of Columbus*, 328 F.3d 244, 261 (6th Cir. 2003) (quoting *Melanowski v. Judy*, 131 N.E. 360, 160 (syllabus) (Ohio 1921)). Still, whether the Officers engaged in any actionable conduct with respect to Cpl. Cort's prosecution, and whether any such conduct is entitled to statutory immunity, are questions for a jury.

### 4. Defamation

Cpl. Cort next asserts a claim for defamation under Ohio law. To succeed on an Ohio defamation claim, a plaintiff must show

> (1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement.

28

*Croce v. New York Times Co.*, 345 F. Supp. 3d 961, 973–74 (S.D. Ohio 2018) (Graham, J.), *aff'd*, 930 F.3d 787 (6th Cir. 2019) (quoting *Am. Chem. Soc. v. Leadscope, Inc.*, 978 N.E.2d 832, 852 (2012)). Cpl. Cort alleges that the Officers' reports contained false statements about him "ramming" them with his wheelchair and spitting water on Deputy Caldwell. Nothing in the record evidence—including the various angles of video footage—clearly establishes whether these statements are true or false. The issue thus must be put to a jury.

### 5.    Civil Trespass

Under Ohio law, the tort of "trespass upon real property occurs when a person, without authority or privilege, physically invades or unlawfully enters the private premises of another whereby damages directly ensue." *Apel v. Katz*, 697 N.E.2d 600, 607 (Ohio 1998) (internal quotation and citation omitted). Having found that the Officers entered the curtilage of the Corts' property without a warrant, consent, or exigency, summary judgment on the civil trespass claim is **GRANTED** to the Corts.

### 6.    Criminal Conduct

Finally, the Corts assert a claim to recover civil damages for criminal conduct. Ohio Revised Code § 2307.60(A)(1) provides that "[a]nyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law." *See Jacobson v. Kaforey*, 75 N.E.3d 203, 205 (Ohio 2016). The Corts assert that the Officers committed three criminal acts upon which they seek to recover in damages: (i) deprivation of civil rights under Ohio Rev. Code § 2921.45; (ii) false incrimination under Ohio Rev. Code § 2921.13;

and (iii) criminal trespass under Ohio Rev. Code § 2911.21. The Corts' only argument for summary judgment on this claim is that the underlying crimes "track the elements of the [civil] claims described above." (ECF No. 47, PAGEID # 1530.) Because the Corts concede that this claim is duplicative of those already discussed, the claim is **DISMISSED**. *Cf., McPherson v. Kelsey*, 125 F.3d 989, 996 (6th Cir. 1997) (concluding that the court did not need to put flesh on the bones of a skeletal argument).

## IV. CONCLUSION

For the reasons set forth above, the Pataskala Defendants' Motion for Summary Judgment (ECF No. 49) is **DENIED** and the Corts' Motion for Summary Judgment (ECF No. 47) is **GRANTED in part** and **DENIED in part**.

The following issues remain for trial:

- <u>Count One</u>: Section 1983, Fourth Amendment
    - Unlawful Search — Damages
    - Unlawful Detention — Damages
    - Unlawful Arrest — Damages
    - Malicious Prosecution — Liability and damages
    - Municipal Liability — Liability and damages
- <u>Count Two</u>: Battery — Damages
- <u>Count Three</u>: False Arrest — Damages

- <u>Count Four</u>: Malicious Prosecution — Liability and damages

- <u>Count Five</u>: Defamation — Liability and damages

- <u>Count Six</u>: Civil Trespass — Damages

**IT IS SO ORDERED.**

<u>/s/ Sarah D. Morrison</u>
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**